Okay, here we go. So we'll start. First case, Harris versus Remington Arms Company. This is 19-605-1. And we'll hear first from Mr. Schrager. Thank you, Judge Bachrach and panel. May it please court, this is basically a simple case. It's a case about a Remington rifle that fired without pulling the trigger and injured my client Joanne Harris very seriously. Judges, juries, and experts are allowed to rely on a witness's description of events in their search for the truth. An expert can rely on his logical reasoning in forming his opinion. Mrs. Harris's testimony is her rifle fired without the trigger being pulled when the safety caught in the netting camouflage of her ear bone. Remington says you can't believe Mrs. Remington, Mrs. Harris, pardon me. No rifle, and Remington concedes this, no rifle should go off when the safety moves from safe to fire. Likewise, Remington concedes no rifle should fire without pulling the trigger. Plaintiff's expert Charles Powell relies on Mrs. Harris's testimony, Mrs. Harris to say when the solid loctite bond on the inside of the gun broke and fired the rifle. Despite the ruling of the court, Powell's opinion fit the facts of the case. When Mr. Powell looked inside the rifle with a microscope, he saw a broken, cured, solid loctite bond. There are many things that can cause the formation of a solid loctite bond. Dirt, debris, basically anything that would include oxygen from getting to the loctite. The tests that were done in this case that Remington relies on for summary judgment looked for the wrong defect, liquid bond, and not a solid broken bond. There is no test on the Harris rifle that could reform a broken solid loctite bond because there simply wasn't enough liquid loctite to form a second bond. That was the only thing that was shown by the temperature testing that was done. There's criticism of Powell for not doing testing, although he did a lot of testing. But beyond that, there are other ways to prove scientific reliability other than testing. That's what this court taught us in the Bittler case. A valid scientific methodology can be proven through an expert's training, experience, observation, and deductive reasoning. Your Honors, the simple truth is Mrs. Harris testified the rifle went off without the trigger being pulled. Powell's microscopic observation of the broken loctite bond confirms Mrs. Harris' testimony that the rifle fired without pulling the trigger. Bottom line on this is a trial court court cannot and should not weigh the testimony, pick a scenario it likes, and adopt that scenario, and then pick an opinion to support that scenario. The weighing of competing inferences from disputed facts and disputed expert opinions should not be decided on summary judgment. There are questions of facts in this case, and there are opinions that differ in this case. Both are disputed and need to be decided by a jury. That's in the Appellant's Appendix 207-209. The simple truth is Mrs. Harris says her rifle fired without the trigger being pulled. That's in the Appellant's Appendix 256-257. Mrs. Harris' sworn testimony should not be ruled out on summary judgment. It amounts to a weighing of the evidence, and it's an abuse of discretion. The testing that was done on the rifle, the joint testing, were temperature tests. The temperature tests that Remington relies on for summary judgment looked for a liquid bond, the wrong defect. This created a false negative. Powell's microscopic observation of the broken loctite bond in fact confirmed Mrs. Harris' testimony that the bond broke and the rifle fired without pulling the trigger. All tests have limitations because they can produce false negatives and false positives. No one could be more aware of that than we are right now with the COVID-19 pandemic, excuse me. But the false negative temperature tests that were done do not make Powell's microscopic observations of the broken loctite bond unreliable. The simple fact is there just wasn't enough sufficient liquid loctite to form a second bond of the blocker screw and the trigger. And that's at the... Is that all right? Yes, you're on. Yeah, sorry to interrupt you. I went beyond three minutes there, pardon me. No, no, no, no. You're welcome to go well beyond three minutes. No, I just wanted to interrupt you if you don't mind and I have a quick question. In terms of the exclusion of Powell's testimony, you make an argument in your opening brief that even if Mr. Powell's testimony was appropriately excluded, that just as you alluded to just a moment ago, that Mrs. Harris said the gun fired without her pulling the trigger and you make the argument in your blue brief essentially that, well, guns don't just fire without pulling the trigger, that there was something that was wrong with that. I wanted to ask you about that because Judge Paltz said on page three of his ruling that the plaintiffs had not argued that their claims would survive if Powell's testimony is excluded. And I haven't seen anything in your opening brief or in your reply brief where you challenged that. So if we conclude that Powell's testimony was appropriately excluded, or at least that Judge Paltz did not abuse his discretion in excluding it, would you concede that summary judgment was proper at that juncture since the plaintiff on summary judgment was relying solely on the invincibility of Powell's causation testimony? No, your honor. We wouldn't agree with that. We feel that the recall alone for excess loctite, pardon me, excess bonding agent, that's the reason these rifles were recalled. And there are two different ways in which excess bonding agent, which is called loctite 660, can create a bond and make the rifle fire without pulling the trigger. And Remington knows this. Remington knows excess loctite 660 can result in at least two unintended fire on safety release wounds. Excess liquid loctite 660, which can cause a failure on safety release under environmental conditions, and excess loctite 660, which has cured loctite between the blocker, the screw tip, and the trigger tip base. Once this bond, cured bond fractures, then it will never re-bond again, absent sufficient loctite. And the proof is, your honor, that it's like a broken, it's like a filament in a light bulb. Once that light bulb is shaken and the filament is broken, it'll never form again. Only in this case, the temperature testing, all it did was prove that there wasn't sufficient liquid loctite. Okay. So Mr. Schrader, let me ask you a follow-up question about that. So, Judge Paul, one of the other things he said was that there wasn't a fit between Mr. Powell's testimony and the facts, because he relies on Benjamin Harris's deposition testimony. Then in 2012, when he cleaned the gun, that he adjusted the safety on and off. And that under your, under Mr. Powell's theory, because of what you just said, that the cured bond between the blocker screw and the trigger mechanism would have broken at that point, and that it couldn't have reformed, as you just said. So, what's wrong with what Judge Paul's explanation for why Mr. Powell's explanation for why the gun fired on November 12th when Mr. Harris cleaned the gun? Your Honor, thank you for that question. It's a very good question. The issue in this case, and I think the trial court kind of got backwards, is the issue is when the bond broke, not when it was formed. It's like a smoker who smoked Palmetto for 40 years, and the doctor tells him he has cancer. It's not the issue of when did it form, it's he has the cancer now. But the truth of the matter is when the temperature testing was once a bond breaks, which Powell's testimony was consistent throughout this, entire, all his affidavits, everything he's written in the court was consistent, that this failure, pardon me, the firearm safety release was caused by a broken Loctite bond. And had the bond been broken when Mr. Harris cleaned the rifle and put it away for winter the year before, and the temperature testing that was done, and there wasn't sufficient liquid Loctite to form a second bond, then there's no, excuse me. Well, I wanted to interrupt you. This is Judge Moritz. I'm not sure, hi, I'm not sure that I understand this question. What I understood from Mr. Powell's deposition, your expert's deposition, was that he conceded in that deposition that if Mr. Harris, as he testified, had cleaned that rifle in 2012, and the same conditions had been in effect temperature-wise, that yes, there would have been this bond, and there would have been a one-time break of that cured bond. And Mr. Harris testified that he did so, that he did clean the gun in 2012. So I guess I'm confused. If he concedes that that would have occurred, the temperature conditions were the same, there would have been a break, and he also concedes that it's not a repeating instance, I'm confused as to how there could have been another break in 2013. It's a logical analysis that he followed, your honor. Let's assume, Arguendo, that the bond was broken, indeed, and that there was a bond that was formed and broken in 2000 when it was cleaned and put away in the fall before her injury. Running the temperature test, we proved that there wasn't sufficient liquid loctite to form a second bond. And in order to give Mrs. Harris sworn testimony under our Ouija instruction 12.4, that the rifle fired without a trigger pull when the safety moved from safe to fire means the bond couldn't have broken when Mr. Harris cleaned the gun and put it away in the fall. It had to have formed in between the time the gun was put away and the time the rifle fired. That's the only explanation that explains the circumstances of how her sharing occurred, given her sworn testimony. And that is an absolute question of fact. And by process of elimination, the only way you can account for the fire safety release at the time that the safety caught in the camouflage netting, given that there wasn't a second bond formed, is that there was not a bond when Mr. Harris put the rifle away for the winter. And that's despite the fact that the temperature conditions that Mr. Powell indicated would have caused the bond to form would have been the same prior to 2012 as they were in 2013. There are many things besides temperature, Your Honor, that can cause a solid loctite bond. Dirt, debris, anything that includes oxygen from getting to the loctite can cause a loctite bond to form. I understand that, but I understood that your expert did rely on temperature excursion as what actually cured the loctite and formed the one-time bond, at least in his prior opinion. No, as a matter of fact, he testified in his affidavits, and they're consistent throughout, that the cause was a broken loctite bond. But the only reason we agreed to the test was to see if there was sufficient liquid loctite left to form a second bond, Your Honor. That's where the confusion comes from. Okay, thank you. And, in fact, if you accept Mrs. Harris' testimony as true, which, on summary judgment, reviewing this de novo for an abuse of discretion, this court has to do, you have to give Mrs. Harris' testimony its full weight. And Remington wants the temperature test. Mrs. Harris says the rifle fired without a trigger pull, that in itself creates a question of fact. Charles George can't weigh testimony, pick a scenario that he likes, adopt that scenario, and then pick an opinion to support that scenario. Okay. Mr. Schrader, I think your time is up. Okay. Yeah, that's what I wanted to ask you, Mr. Schrader, is if you're still in. I want you to be able to answer Judge Morris' question, but I was afraid you were starting to move on to another point. Was I wrong about that? No. Okay. So, Judge Morris, do you have any additional questions for Mr. Schrader? No, I don't. Thank you. Okay. Judge Murphy, do you have questions? I do. Mr. Schrader, as I understand it, that in addition to the statement Mrs. Harris made in her about the netting engaging the safety, she made statements outside her deposition before that that are inconsistent with that, didn't she? Yes. What do we do with her? What do we do with this on summary judgment? She says one thing on day one and a different thing on day five. What do we do with that? When I said yes, I don't see anything inconsistent about her statements. She told a nurse... Okay. What was her statement before her deposition? Wasn't it that the netting engaged the trigger? I didn't hear you, Your Honor. Can you repeat that, please? Wasn't her statement outside the deposition that the netting engaged the trigger? No. Her statement was that the netting engaged the safety, and the safety moved and pulled the trigger. I thought that's what she said in her deposition. No. She said the safety moved and it went off. All right. And when I interviewed, and it's in the record, unfortunately I can't... Well, that's good enough. I'll just look at the record. Thank you. You've answered my question. Can I point one thing out? You may. Yeah. Her name was Nurse Stark, and she admitted in the deposition that moving of the safety and the gun going off, she may have just assumed that meant pulling the trigger. And she couldn't confirm that at all, and it was not diagnostic either. All right. I understand your explanation. Let me ask you this. Are you no longer relying on Powell's affidavit number one and affidavit number two? No. We are relying on affidavit one and two and three. It's a mollycoat that, if anything, should be stricken, not Powell's testimony. Just because experts come up with different opinions based on the same facts doesn't mean that the experts should be excluded. So you are relying on all three affidavits? I may be miscounting. He did three affidavits. Yeah, three affidavits. I was thinking four. Pardon me. I'm recovering from a closed head injury. I had a bad concussion. No. We're relying on the first two affidavits, and if the mollycoat affidavit is stricken, in all due respect, we should have asked for the right to write a rebuttal report. We didn't do it. We didn't follow procedure. But if I could follow up on that, I want to say there's no way they were prejudiced by this because they knew mollycoat's a curing agent. In fact, the case that Remington sent down to the to the court of supplemental authority... Mr. Schrader, you've answered my question, but in an unclear fashion. So let me state it again. Thank you. You would like to rely on... Is the mollycoat affidavit number three first? Yes. All right. You would like to rely on that. Isn't that correct? No. It's not essential that we rely on it. We would like to, but we... Okay. You've answered my question. You'd like to. Okay. The next question is, if you're allowed to do that, do you no longer want to rely on affidavit one and two? No. We want to rely on all three. I mean, his testimony is consistent throughout. It was caused by a broken solid loctite bond, your honor. All right. I have no further questions. I have no further questions. Okay. Okay. Thank you, Judge Murphy. And I don't... Mr. Schrader, you've already answered all of my questions, so I appreciate it, Mr. Schrader. Before I turn to Mr. Wills for the appellate he's already given in this case, I just want to make sure everybody knows, because I hope I didn't confuse anybody, nobody has to stop after three minutes. I just wanted to let you all know that we're not going to interject any questions after the first three minutes, but you need not stop after the first three minutes. Mr. Wills, time is yours. Thank you, your honor. This is Judge Murphy. Before you start, Mr. Wills, could the court make sure we get a clear bell ringing after the total 15 minutes has been consumed? Thank you. Yes, your honor. I'll ring the bell louder. Hopefully that'll... Thank you. All right. Thank you. Good morning, your honors. May it please the court. There are only three issues presented for review in this appeal. One, did the district court, Judge Scott Paulk, abuse his discretion in striking plaintiff's expert's third affidavit of January 3rd, 2019, advancing for the first time his migrating Molly Cope theory? That theory of causation was submitted after his initial two affidavits, after his rule 26A2B report was submitted in November, after his deposition was taken in November, and after the close of discovery. The second issue presented for review is, did Judge Paulk abuse his discretion in granting Remington's motion to exclude Powell's rule 26A2B causation opinion, the original opinion in his report and affidavits, because it did not fit the facts of the case. As has been discussed during the course of this argument already, the facts of the case were undisputed as to his original theory. That being that if that rifle was stored with the safety on, as plaintiff Benjamin Herod testified it was from 2011 to 2012, his manipulation of the Mr. Powell went on to testify at his deposition that if that occurred, then none of the defects, none of the Loctite defect he alleges would not have been a cause of this occurrence. And the third issue on appeal is whether having excluded Powell's causation opinion, Judge Paulk properly granted Remington's summary judgment motion when plaintiffs lacked admissible expert opinion evidence on the essential causation element of their claim. The law is clear that without admissible expert testimony on causation on that essential element, summary judgment is appropriate. Obviously Remington submits that the district court did not abuse his discretion in his rulings on the first two issues, and as a result, his ruling on the third issue, the granting of summary judgment was proper. For those reasons, Judge Paulk's rulings should be affirmed. And I'd like to talk as to the first issue about the granting Remington's motion to strike his third affidavit and his migrating Molly Cope opinion. That affidavit, as I mentioned before, was filed after the close of discovery, after his rule 26 A2B report in November, where he was supposed to set out complete opinions and basis for those opinions. In fact, it was filed 43 days after Remington's expert filed his rule 26 report. Plaintiffs violated the existing scheduling order, and they violated rule 26 requirements about timing of expert disclosures. An expert opinion disclosed after the deadline, rule 26 A2B disclosures should be excluded. We cited the Means case and the Richardson case, which states, otherwise they would make a mockery of the complete disclosure requirement of rule 26. This is especially true when filed after the disclosure deadline in a belated effort to avoid a pending dispositive motion, which we had in this case. And the sanctions for failing to comply with the complete disclosure requirement of rule 26 is automatic and mandatory exclusion under rule 37 C1, unless the nondisclosure was justified or harmless. We talked in our brief about the four factors to consider whether it's justified or harmless, and we cited the Martinez versus the Target case. Judge Paulk stated that the late disclosure of Powell's third affidavit was not substantially justified or harmless. That's at the appendix of 1297 to 1300. Powell's original opinions in two affidavits in his expert report was that this block type cured and bonded during the 2011 to 2012 storage period and was broken when Benjamin Harris moved the safety to fire. That's also stated in plaintiff's reply brief that filed in the lower court at AA 426. Powell had either ignored or failed to appreciate Benjamin Harris's testimony when he moved the safety back and made 2012. Isn't there another possibility, and that was that there was additional liquid loctite that had not yet cured, which Mr. Powell did say because he was asked in his deposition about the very point that you're making, and I thought he had said that if there was additional liquid loctite after Mr. Harris had cleaned the gun and adjusted the safety in 2012, that the liquid loctite presumably could have reformed and cured another bond, and that bond would not have been broken until November 28, 2013. What's wrong with that? Two things to say to that. His opinion in his expert report and in his deposition is that once it was broken, it would never re-bond. And secondly, at his deposition, we ask him this question. Do you have an opinion as to whether on the Harris rifle there is still sufficient excess liquid loctite to produce a fire-on-safety-release discharge in the future? Answer, there has been no indication that that is the case. It's been functioning... But that's after November 28, 2013. But what about from 2012 when Mr. Harris adjusted the safety to November 28, 2013? So during that window of time, couldn't there have been additional liquid loctite that had re-cured, formed a bond between the blocker screw and the trigger mechanism, and that when she broke the... And then when she got the rifle caught in the netting and that it pulled the trigger that... Or not pulled the trigger, but that the gun fired, and then the bonding broke, then I think what you're talking about is... Then your question in the deposition was, well, was there additional liquid loctite at that point? And of course, you're right, the answer was no. But that doesn't answer the period between 2012 and November 28, 2013, does it? Well, I think we're also asking Judge on... At AA-495, that if Benjamin Harris did that, moved the safety, broke the bond, when she took the rifle hunting on that day, the accident would not have been caused by cured, solidified loctite between the blocker screw and trigger. You would agree with that. And his answer was, I would agree with it if it was not present at the time the injury occurred, when it would not have been a causing event of this particular failure. And nowhere in his reports, and even in his third affidavit, which Judge Paulk has stricken, did he ever indicate that there was, or state an opinion, that there was additional sufficient liquid loctite existing to somehow have rebonded after it was broken when Benjamin Harris moved the safety to the fire position at the end of 2012. Let me just pick up where I left off, unless there are other questions, if I can address those. Judge Paulk said that plaintiff's late disclosure of the third affidavit was not substantially justified or harmless. Remember his original opinion. In his two affidavits, in his report, these temperature excursions, storage of the rifle with the safety on, caused it to bond then. And once the safety was moved to fire, it broke. And then it would never rebond thereafter. That was his expressed opinions in those affidavits, and then in his expert report. So I think that also addresses the question of what you just raised with me, Your Honor. But here's what the fact of the matter is. What happened is, after his deposition, being confronted with that testimony of Benjamin Harris, whether he failed to consider it, or it skipped his mind, or whatever, plaintiffs then had a big problem. They knew, according to Powell, that bond was broken and would never rebond. So then they had turned to the new theory of migrating mollicoat in an effort to survive the pending Dalbert motion, which the court struck as untimely for the reasons we stated earlier, in addition to never having tested that theory, or at least never having provided any evidence of testing that untimely disclosure of Powell's new opinion. After his expert report, after his deposition, after the closed discovery, prejudice Remington, and Remington had no way to cure that prejudice. In fact, his migrating mollicoat opinion also contradicted his prior deposition testimony, that mollicoat prevents adhesion of the parts, and that's an AA484. The case law on this prejudice issue is clear. Depriving opposing counsel of the experts of final opinions before his deposition is prejudicial. Smith versus Ford. The second deposition is not only not contemplated by the rules, it is prejudicial to the opponent in terms of additional time and expense, the Richardson case. Counsel? Yes. This is Judge Moritz. Hi, Judge. I guess, hi. I guess I understood that, you know, it wasn't necessarily contemplated a second deposition, but can you tell me why that would have been so prejudicial? Had the court simply ordered essentially a continuance and permitted a second deposition where you could point out all the flaws of regarding Mr. Powell's third affidavit as you, you know, as you are, I'm sure, able to, and why couldn't it proceed with a simple delay? Well, first of all, on this issue of proceeding with a delay and this issue that Mr. Schrader raised, well, maybe I could have done a rebuttal report. If you don't prepare such a rebuttal report that is being waived. And as Judge Pauk said on this very waiver issue at the trial court level, the plaintiffs have not proposed any ways to mitigate the prejudice to the defendant. Regardless, your honor rule 26, A2B allows only 30 days for proper rebuttal testimony here or a rebuttal report here. Watkins report, the defendant's experts report was served on 11, 21, 18, 43 days before the disclosure of this third affidavit. So it was too late under rule 26, A2B. Um, you know, the, what this really does, this kind of changing opinions from initially liquid loctite and cold temperature to loctite caused by temperature excursions and bonding to now molly coat is it makes a mockery of the court's scheduling orders, which have been long in place here in this case. Um, they judge Paul also makes an interesting observation. The plaintiff's only attempt to justifies Powell's untimely new opinion was that they were unaware of effective molly coat until Watkins discovered it. That's an AA 1299. In fact, Remington had produced manufacturing records in April of 2016, showing Molly coat application in the production process. Powell testified in his deposition that he knew Molly coat was used in the factory assembly process because he had reviewed those records. Third Watkins affidavit of six 2018 stated that Molly coat was covering the exposed loctite six 60 and Powell himself in his second affidavit identified the presence of loctite. So isn't the presence of loctite, which you're your own expert identified, isn't that different than whether it actually could have cured? I mean, I'm sorry, the presence of Molly coat, isn't that different than whether it could have actually cured the excess liquid loctite, which is what he eventually learned through your expert. But he is an expert witness. He knows the presence of these materials. I'm just trying to clarify what it is that was new, I guess, for him with your experts information. And I think it's the fact that not just that Molly coat was present, but that it might have cured, that it could cure excess loctite, which doesn't get you to his opinion either. But that was something new, at least in terms of information to him. And I am right argument, what you're saying is he couldn't discover that himself. But that was new to him in terms of information that you had presented, correct? That was new, that it could cure it. But that was certainly available to him to have made the same evaluation our expert did. Instead, he offered, under oath, other testimony and other opinions about why it cured. I recognize that as two bells. Well, it is two bells, and I appreciate Kevin's layout of the ring and the bell. So, you are out of time. So, under our ground rules, Judge Moritz, do you have any additional questions? You're welcome to. No, I don't. Thank you. Okay. Judge Murphy, do you have additional questions? Maybe I'm- Judge Murphy? This might be- I'm sorry, I moved my microphone. Oh, that's all right. These are my first questions. Mr. Wells? Yes. In the deposition of Powell, did he acknowledge, did he know that mollicoat was present? Yes. And did he, as I understood, you said that he stated that mollicoat inhibits or prohibits bonding? That's what he said in his initial, in his deposition in this case. It causes loctite not to adhere to the parts. Yes. And his affidavit three is to the contrary? It's absolutely contrary, as Judge Paulk, for the reasons Judge Paulk pointed out. Yes. Okay. In his affidavits one, two, or his testimony, did he go through a differential diagnosis-type thing, eliminating particular causes? He did not. He offered the opinion simply that the storage and the temperature excursions when the safety was on would cause the bonding, and the bonding would break the next time the safety was moved. All right. In his affidavit three, then he does indicate, as I understand you say, contrary to his testimony, that mollicoat migrated and caused the bonding. Right. That's what he did off of that. Okay. Did anybody testify as to why the mollicoat waited until post-2012 to begin migrating? No, and in fact, nobody testified. He offered no reason for it not moving during assembly, not moving during shipment, or at Walmart, or in their prior usage, or after 2012. So we don't... Okay. That's all the questions I have. Okay. I've got a couple of questions, Mr. Wills. So on the issue of whether, on summary judgment, whether or not there is a need for expert testimony, can I ask you a hypothetical question? Let's say I go this afternoon to a retail store and buy a pair of socks, and I put them on, and the socks explode. And I give them to the world's greatest experts, and they say, I have no idea. I've done all of these elaborate, sophisticated tests on these socks. I have no idea why they exploded. And I sue the manufacturer or the retail store on the product's liability theory, and my theory is just very simple. Socks don't explode. And I don't have an expert. I'll gladly tell you, I hired the world's greatest experts, and they have no idea. The socks don't just explode. Do I lose on summary judgment on causation since I haven't hired...since I don't have expert testimony that can explain to the jury, particularly, why the socks exploded? Or can the jury simply reasonably infer for purposes of causation that there was an obvious defect and that that caused the socks to explode? Well, I think you would need it, especially, and I think the Bittler case addresses when the only situation is explained in Bittler when testing does not require the validated causation theory, and that is when the science is well established. There would be other issues, potentially, in the case you're describing with exploding socks of what was the history of the prior storage of the socks, the handling of the socks. Had materials gotten on them? Is there another alternative explanation for it? So under that scenario, I think expert testimony would be required, and it's not just permissible to say, well, circumstantial evidence allows it. If that were the case, that would apply to almost any type of product liability case, for example, a rollover of a car. Well, we don't know why it rolled over, but cars aren't supposed to roll over. An airplane coming out of the sky. We don't know why, but it's not supposed to do that. Any number of things. So that is why expert testimony is required, especially on issues like the one issue in this case involving an interaction of two materials inside a trigger mechanism, Loctite and Molycote. Expert testimony would certainly be required on that. That's really the underlying premise of my question is assuming that that is an invalid positive theory based on just the idea that maybe it wasn't whatever Powell said, or it wasn't the Molycote. I don't know why the gun fired, but everybody knows that rifles don't fire without somebody pulling the trigger. But you answered my question. But let me ask you a follow-up question. How do you reconcile that with restatement of Section 3, Circumstantial Evidence Supporting Inference of Product Defect? It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution without proof of a specific defect when the incident that harmed the plaintiff was of the kind that ordinarily occurs as a result of a product defect. Why doesn't the plaintiff simply rely on restatement of Section 3? Well, I would point you in this case to the Daubert testimony of Mr. Powell, where he addressed any number of reasons why rifles may fire that have nothing to do with when users claim they didn't pull the trigger but are unaware of that. Users are often unaware of having pulled the trigger. Here, we have even more. We have the plaintiff's statement to Nurse Starr, as documented in the medical record that's part of the record, that the mesh pulled the safety off and pulled the trigger. Well, isn't that just a classic fact issue? That's not a sham affidavit. That's just a prior and consistent statement. You could cross-examine Mrs. Harris and say, you know, isn't it true that you said to the nurse something totally different? Yes, you know, were you lying then or were you lying now? You know, that kind of thing. But I don't know that a prior and consistent statement has ever been the basis to say that sworn testimony is not enough to create a genuine issue of material fact on that point. If I'm wrong about that? Well, I think it is when you have to, when you have the issue of causation. And here, we have a rifle that functioned flawlessly in all of its tests. And even, I think we cited the Tabor case in response to the Bittler case cited by the plaintiff. Under that best inference case or circumstantial evidence case type analogy, it requires the expert to exclude other possible causes as highly improbable and show his identified cause as highly probable. Okay. Let me just ask you one last question and then I'll quit. One of the things that I've struggled with, and I'm not sure how it cuts, is both sides, on summary judgment at least, have argued well beyond the very short, very limited motion for summary judgment that you to replicate the defect, the bonding, through testing. And to my recollection, and tell me if I'm wrong, that was the sole argument. And so, all of these additional arguments are, that Judge Paul relied on. I mean, basically, he included the fit, the whole fit theory, that there wasn't a fit because of what Mr. Harris did in 2012 in adjusting the safety. None of that's in the summary judgment motion. So, how can we uphold the summary judgment ruling based really on all of the things that you said and really all of the things that Judge Paul said? But none of that's in the nine or 10 pages of your summary judgment motion. Well, I believe the summary judgment motion went to the fact that there was no proof of a defect causing the occurrence. The testing showed that. So, we did raise the issue that on the essential element of causation, they did not have admissible evidence of that. Our subsequent motions after Mr. Powell's deposition was a motion to exclude his causation opinion under Daubert and Rule 702 grounds. And once that was done, and once the court agreed that upon reviewing his report and reviewing his prior testimony, that his causation opinion, the new one, the never tested, or at least disclosed any test results to us, requires exclusion of that. And once that happens, the defendant is entitled to summary judgment because plaintiffs have failed to make a prima facie case on the essential element of causation needed for their product liability case. Okay. Thank you very much, Mr. Wills. That's all I had. Thank you. Kevin, I think the appellant is out of time. Is that correct? Yes, he is out of time. Kevin, this is Jack Schrader here. I didn't hear a bell the three minutes telling me that we only had three minutes left. And I, my stopwatch, I was only at, I was at 13 minutes, but I would like to rebut just a couple points, Your Honor. And if I can't, that's fine too. We'll just go with what we've done. Well, let's, let me clarify that. I heard there was, there was one, he, he, he rang one bell when you had three minutes and then, and then he rang two bells when you were out of time. And I heard that. And I'm sorry. Yeah. So that, that was when you were out of time. And that's what I was trying to explain before we got started, that I'm going to give my colleagues ample opportunity to ask additional questions. And so, Mr. Schrader, when he, when Kevin kept ringing that bell twice, that was just, that was just telling the panel and I that you were two minutes over time. So I don't, I forget how many times Kevin rang the bell twice, but, but it was quite a bit over time. But then under our practice, and this is true when we have argument in, in the courtroom, that when you go over time, I was letting, letting that proceed because I wanted my colleagues to have their questions answered. So I, I, I apologize if, if you didn't hear that, but yeah. And, and if, if, if we hadn't gone so far over, I, I think I might have an opportunity to give you some additional time but I'm afraid, I'm afraid we just don't have additional time. But I do appreciate it, Mr. Schrader and Mr. Wills, both of you did a very good job in your presentations. And, and I do want to put Mr. Schrader's mind at ease as far, and I know you have additional things that you want to say, and I know Mr. Wills probably does as well, but we, we have studied the briefs very, very closely and, and, and we'll give it careful attention as we already have. So thank you. This matter will be submitted and we'll move on to the next case.